# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TEXARKANA DIVISION

| | | |
|---|---|---|
| **ESN, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO. 5:08-CV-20** |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **CISCO SYSTEMS, INC., and** | ) | |
| **CISCO-LINKSYS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STAY PENDING REEXAMINATION

## I. INTRODUCTION

Plaintiff, ESN, LLC ("ESN") opposes Defendants', Cisco Systems, Inc. and Cisco-Linksys, LLC (collectively "Cisco"), motion to stay this case pending a final decision on the *inter partes* reexamination ("IPR") of United States Patent No. 7,283,519 ("the '519 Patent").

Cisco fails to demonstrate that it will suffer any "hardship or inequity in being required to go forward" (*Landis v. North American Co.*, 299 U.S. 248, 255 (1936)) and it fails to carry its burden to "show that there is a pressing need for a delay" (*Castanho v. Jackson Marine, Inc.*, 484 F. Supp. 201, 209 (E.D. Tex. 1980)). Instead, Cisco relies on two primary arguments in support of its motion. First, Cisco argues that a stay will not prejudice ESN because the Patent Office will purportedly act "expeditiously." Second, Cisco argues that it is likely that the IPR will narrow or eliminate the present litigation and that it is not seeking "two bites at the apple." Cisco's arguments lack merit.

Contrary to the misleading statistics cited by Cisco, recent studies show that the time necessary to reach a final decision (including internal Patent Office and external Federal Circuit appeals) on an IPR is an average of 78.4 months and growing. (Ex. A at 1.) This would likely delay a trial in this action (now scheduled for April 2010) until the year 2016 or beyond. This undue delay would cause substantial, irreparable prejudice and tactical disadvantages for ESN.

Moreover, Cisco's assertion that the IPR will narrow the issues in this case is speculative at best and disingenuous at worst. Cisco fails to inform the Court that, in addition to the 13 alleged prior art references that Cisco has asserted in the IPR, it has identified over 100 additional alleged prior art products in its P.R. 3-3 invalidity contentions. (Ex. B at 5-7.) Thus, Cisco apparently hopes for a scenario where sometime in 2016 or later – after the '519 Patent is dragged through the Patent Office and appeals and finally determined to be valid over the 13

1

prior art references presented in the IPR – Cisco will retry the validity of the '519 Patent in front of this Court. It is apparent that Cisco is seeking much more than two bites at the apple, and is hoping that the apple will rot before ESN gets its first bite.

Cisco's Senior Vice President and General Counsel, Mark Chandler, in testifying before Congress, criticized potential delays caused by patent reexamination proceedings:

> [A]s the holder of over 2500 patents (and applications for over 4000 more), we recognize that the post-grant review process cannot unfairly burden the patent holder with dilatory, duplicative and expensive proceedings. ***The principle that justice delayed is justice denied applies with equal force to the patent process.***

(Ex. C at 4 (emphasis added).) Nevertheless, Cisco seeks to delay until the later part of the next decade any consideration of Greg Girard's (the inventor and co-owner of Plaintiff, ESN) infringement claims while Cisco continues to reap the benefits of Mr. Girard's invention.

The history of this dispute demonstrates that Cisco's present motion is consistent with Cisco's strategy of winning by attrition and other improper means, rather than on the merits.

## II. BACKGROUND

Cisco would have this Court believe that this dispute started on January 31, 2008 with the filing of the Complaint in this civil action. But, there is more to the story.

### A. Pre-litigation History of Dispute

- ESN is a company formed and 50% owned by Greg Girard, the inventor of the '519 Patent.
- The '519 Patent is the result of a patent application filed by Mr. Girard on April 14, 2002, which is based on a provisional patent application filed on April 13, 2001. (Ex. D, '519 Patent, cover page.) The patent application was published in November 2002. (*Id.*) Through no fault of Mr. Girard, the Patent Office delayed substantive examination of his patent application, and the '519 Patent did not issue until October 16, 2007. (*Id.*) The Patent Office acknowledged that the examination of Mr. Girard's patent rights had been

- unduly delayed by adding nearly three years to the *end* of the term of the '519 Patent. (*Id.* ("the term of this patent is extended … under 35 U.S.C. 154(b) by 1052 days.").)

- After filing for patent protection, Mr. Girard fully intended to manufacture and sell products embodying his invention. He formed a company and began preparation to do so. Mr. Girard received high praise from industry leaders such as SBC and Verizon for proposed products that were to embody the inventions of the '519 Patent.[1] However, the post-9/11 collapse of the venture capital and telecommunications markets destroyed his ability to fund his start-up company. All he was left with for his intellectual, physical, emotional and financial investment and full disclosure of his invention to the public in a patent application was a Constitutional promise that his patent application, once issued as a patent, would grant him exclusive rights to his invention.

- Nevertheless, even before the '519 Patent issued, Mr. Girard elected to share his invention. More than a year before his patent would ultimately issue, Mr. Girard asked Brian Hollander (a co-founder of ESN) to help him license or sell his patent rights to an established company that could use the rights for the benefit of the public. ESN was formed for this purpose and in August 2006 Mr. Hollander approached Cisco. (Ex. E.)

- Mr. Hollander made frequent efforts to engage Cisco in discussions that could result in a reasonable business arrangement. ESN was eventually directed to Cisco's retained outside patent counsel, Baker Botts, purportedly for the purpose of an open and honest

---

[1] E.g.: "Based on our early meetings with Accensus [Mr. Girard's company], my organization is developing a business case based on edge switching for Verizon."; "When is the earliest we can have one to try?" (Michael Weintraub, Director Converged Services, Verizon.) "We've seen nothing comparable from any other vendor." (Jeff Piroga, Sr. Director Technical Product Development, Allegiance.) "The DES solution from Accensus is unlike anything else we've come across. If your vision is correct you could have an important jump start on the market." (Andrea Green, Senior Research Analyst at Lehman.) "The sooner we have DES the better -- absolutely." (VP, DSL.net.) "I really like what Accensus is doing. My view is that what you propose will be the prevailing model within five years. And, as in the case of SS7 and the analogue to digital conversion, the Edge Switch has 'legs' well into the next decade and beyond." (Larry Pearson, Director Product Design, SBC Communications.)

discussion of the merits and value of ESN's patent rights. Instead, Cisco, through Baker Botts, attempted to fabricate an inequitable conduct defense by asserting that certain allegedly material prior art should have been disclosed by ESN to the Patent Office. (Ex. F, letter dated May 26, 2007.)

- While ESN did not agree that the prior art identified by Cisco was material to the '519 Patent, in the interest of full disclosure and eliminating Cisco's fabricated defense, ESN disclosed all of the prior art identified by Cisco to the Patent Office. (Ex. G.) Since a Notice of Allowability (Ex. H) had already been issued by the Patent Office by the time of Baker Botts' allegation, ESN was forced to file a Request for Continued Examination (Ex. G) to make sure the prior art cited by Cisco would be considered by the Patent Office, thereby delaying issuance of the '519 Patent for over four months.

- In June 2007, ESN provided a detailed written explanation to Cisco of how Cisco's products would infringe the '519 Patent upon issuance and confirmed that it had disclosed to the Patent Office all of the prior art asserted by Cisco to be relevant. (Ex. I.) Cisco never even acknowledged this communication, much less responded with any non-infringement argument.

- Importantly, Cisco also failed to notify ESN of any additional allegedly relevant prior art during the time between June 2007 and October 16, 2007 when the '519 Patent was still pending and ESN would have had an opportunity to disclose it to the Patent Office. Cisco thereby deprived the Patent Office of the opportunity to review the prior art Cisco has now asserted in the IPR prior to the issuance of the '519 Patent.

- Since Cisco demonstrated that it was not interested in negotiating in good faith, ESN was left with no alternative but to file a lawsuit against Cisco.

4

### B. Post-Complaint Events

While Cisco and its lawyers' pre-litigation treatment of Mr. Girard could be considered typical of certain large companies that generally disrespect the patent rights of individual inventors, its conduct since ESN asserted its patent rights in federal court has been simply outrageous, and confirming of its orchestrated strategy to deny Mr. Girard the opportunity to enforce his rights as an inventor.

- ESN properly and timely filed a first civil action against Cisco on October 16, 2007 in the U.S. District Court for the Eastern District of Texas using the correct and only available procedure for electronic filing of a Complaint. ESN obtained a case number by filing a civil cover sheet on October 15th and then at 12:01 am on October 16th filed its Complaint.

- Cisco thereafter filed a duplicative Declaratory Judgment Complaint in the U.S. District Court for the District of Connecticut. (Ex. J.) Cisco falsely alleged that ESN's Texas complaint was filed on October 15th before the '519 Patent issued and, therefore, that subject matter jurisdiction did not exist for ESN's Texas action. (*Id*. at 2-3, ¶10.)

- Cisco then began an anonymous public relations campaign intended to destroy the reputation of Mr. Girard, ESN and their attorneys through the "Patent Troll Tracker" blog of its in-house patent counsel assigned to oversee the ESN lawsuit, Rick Frenkel. Mr. Frenkel published the following on October 17th:

  > **Troll Jumps the Gun, Sues Cisco Too Early**
  > ****
  > A company called ESN sued Cisco for patent infringement on October 15th, while the patent did not issue until October 16th, I looked, and ESN appears to be a shell entity ….
  > ****
  > One other interesting tidbit: Cisco appeared to pick up on this, very quickly. Cisco filed a declaratory judgment action (in Connecticut) yesterday, the day after ESN filed its null complaint. Since Cisco's lawsuit was filed after the patent issued, it should stick in Connecticut. (Ex. K at 1-2.)

- On October 18th Mr. Frenkel published the following accusations:

5

**ESN Convinces EDTX Court Clerk To Alter Documents To Try To Manufacture Subject Matter Jurisdiction Where None Existed**
****
You can't change history, and it's outrageous that the Eastern District of Texas is apparently, wittingly or unwittingly, conspiring with a non-practicing entity to try to manufacture subject matter jurisdiction. (Ex. K at 1.)

- Cisco has admitted that it was responsible for the statements made in Mr. Frenkel's Patent Troll Tracker blog. (Ex. L at 4-5.)

- The Patent Troll Tracker blog was widely read by those in patent law circles – boasting a readership of over 100,000. These defamatory publications were obviously intended to materially influence those that would ultimately determine the merits of ESN's dispute with Cisco, including (1) federal judges and law clerks, (2) potential jurors and (3) U.S. Patent Office examiners whom Cisco knew would be examining Cisco's request for reexamination of the '519 Patent.[2]

- Cisco then requested that ESN agree to a stand-down period to discuss settlement. On November 2, 2007, Cisco represented to the Court in Connecticut that it desired "a 90-day stand-down period in which we are going to work in earnest to settle the dispute." (Ex. N at 3-4.) ESN agreed to dismiss its original Texas action without prejudice for this purpose.

- Cisco's representation to the Connecticut Court can only be viewed as less than genuine in light of its subsequent behavior. Cisco refused to disclose any financial data for the accused products, refused to discuss any non-infringement defense, waited until January 10, 2008 to identify an invalidity defense based on two prior art patents[3] and sent Mr. Frenkel to the only in-person settlement meeting with ESN. (*See* Ex. O, P and Q.) The only intention evidenced by this behavior was to delay and buy time to prepare its request for IPR.

---

[2] This is not mere speculation. The information considered by the Patent Office prior to granting Cisco's request for *inter partes* reexamination included several articles by a law professor that comment on and perpetuate the defamatory and prejudicial statements of Mr. Frenkel. (*See* Ex. M (referencing the "Patently-O" blog).)

[3] During settlement discussions, Cisco did not make any reference to the 11 other prior art references that it would assert in its IPR request, which was filed in the Patent Office only one week after this lawsuit was filed.

### III. ARGUMENT

In the interest of fairness and due process, and under the precedent of this Court, Cisco's motion should be denied. *Texas MP3 Tech., Ltd. v. Samsung Electronics Co., Ltd.*, 2007 WL 3219372 at *2 (E.D. Tex. 2007). ESN has a right to a just and speedy trial. Fed. R. Civ. P. 1. "[T]he Court must be aware that a request for [re]examination can be used as a tactical tool to delay a case and impose costs, with no real expectation that any controversy will be resolved." *Anascape, Ltd. v. Microsoft Corp.*, 475 F. Supp. 2d 612, 615 (E.D. Tex. 2007). Cisco's conduct throughout the parties' dispute demonstrates that its motion to stay pending IPR is nothing more than another attempt to delay the inevitable, without any realistic expectation that the issues raised by this action will be meaningfully narrowed or eliminated.

A "resolution of a motion to stay must begin with consideration of the landmark decision in *Landis v. North American Co.*, 299 U.S. 248 (1936)." *Unidisco, Inc. v . Schattner*, 1981 U.S. Dist. LEXIS 14890, *13 (D. Md. 1981). In *Landis*, the Supreme Court held that a party moving "for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else." *Landis*, 299 U.S. at 255. To that end, the "burden is squarely on the party seeking the stay to show that there is a pressing need for a delay." *Castanho*, 484 F. Supp. at 209.

While a court has discretion to grant a stay if warranted by the particular circumstances at play, there is absolutely no obligation "to stay judicial resolution in view of [Patent Office] reexaminations." *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001). Instead, the court should "tread carefully" in determining whether a stay is necessary, "since a party has a right to a determination of its rights and liabilities without undue delay." *Tyco Healthcare, LP v. Medrad*, 2005 U.S. Dist. LEXIS 42869, at *24 (S.D. Ohio 2005); *Castanho*,

7

484 F. Supp. at 209 ("Because each party to a lawsuit has a right to an expe[ditious] determination of his claim, . . . the district court must weigh competing interests in order to reach a fair decision.").

This Court has focused on three primary factors when determining whether to grant a stay pending reexamination: "(1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the nonmoving party, (2) whether a stay will simplify the issues in question and trial of the case, and (3) whether discovery is complete and whether a trial date has been set." *Biax Corp. v. Fujitsu Computer Sys. Corp.*, 2007 U.S. Dist. LEXIS 12973, at *3 (citation omitted). These factors weigh heavily in favor of denying Cisco's motion to stay this action.

### A. A Stay Would Cause Prejudice And Tactical Disadvantage To ESN

The stay requested by Cisco would likely delay ESN's right to have its claims against Cisco heard in court until the year 2016 or beyond. Such a lengthy delay, on its face, presents a clear case of substantial prejudice. This would be 15 years or more after Mr. Girard sought patent protection. ESN's right to exclusivity would be essentially eviscerated. Practical concerns of lost evidence, fading memories and even deceased parties, witnesses and chosen trial counsel become very real over such a time period. Moreover, this Court, rather than the Patent Office, is better suited to resolve the validity issues presented by Cisco's IPR due to the lack of discovery tools and limited fact finding ability of the Patent Office. For these same reasons, ESN's rebuttal of Cisco's invalidity defenses will be severely hampered if this case is stayed.

#### 1. ESN Will Be Prejudiced By An Indefinitely Lengthy Stay

In *Biax*, this Court held that "the potential delay for an indefinite period" pending an *ex parte* reexamination "would likely prejudice" the patentee plaintiff. 2007 U.S. Dist. LEXIS 12973, at *4 (E.D. Tex. 2007). Evidence in that case reflected an average *ex parte*

reexamination pendency of 22.6 months, with the possibility of an additional 24 months for appellate review. *Id.* In this case, however, an *inter partes* reexamination is at issue and poses a significantly longer and indeterminate potential delay in proceedings due to the fact that both the patentee and the requester have the right to appeal an adverse decision. Despite a mandate for "special dispatch," the time required to complete an IPR is much longer than reflected in the data cited by Cisco, which in its presentation is both incomplete and highly misleading. *See* Roger Shang & Yar Chaikovsky, *Inter Partes Reexamination of Patents: An Empirical Evaluation*, 15 Tex. Intell. Prop. L.J. 1, 16 (2006) ("Since the first *inter partes* reexamination request was filed in 2001, only three proceedings have been completed with the issuance of a reexamination certificate, and the parties did not appeal to the BPAI or the Federal Circuit in these proceedings.")[4].

Cisco's optimism in predicting a speedy resolution of the IPR is baseless. The Institute for Progress, an independent organization, recently issued an in-depth report analyzing IPR statistics. (*See* Ex. A, Report by The Institute for Progress (April 2008).) Its findings include:

- "The Patent Office has reportedly set a target of 24 months to complete the reexam process, but so far, the actual time to conclude an *inter partes* reexam is far beyond this target. This can not help but raise significant concern to anyone who is interested in the efficient administration of justice in the U.S. Patent system." (Ex. A at 6.)

- "*Inter partes* reexamination requests are rising rapidly – a 6X increase between 2003 and 2007 [from 24 to 142]." (*Id.* at 1.)

- "To date [since the first IPR started in 2001], there has never been a single *inter partes* reexamination that has gone through the entire reexamination process (including appeal) and made it to completion. (*Id.*)

- **The Patent Office's report citing the average pendency of an *inter partes* case as 28.5 months is "mathematically accurate" but "highly misleading. . . . An appropriate reading of the statistic is that the Patent Office takes two years to dispose of a patent through *inter partes* reexam if the patent holder doesn't care**

---

[4] This article focused on Patent Office data through 2005. The total number of reexamination certificates issued as of March 2008 totaled 17, still a miniscule fraction of the 390 total requests filed at that time. (*See* Ex. R.)

9

> **to defend its rights. It takes significantly longer to get to a resolution if the patent holder participates in the process."** (*Id.* at 5 (emphasis added).)

- "**Although no *inter partes* reexam has ever been completed after being appealed, the average pendency for appealed *inter partes* reexam is 78.4 months** (assuming no rework by the patent office or secondary appeal) – a 95% confidence interval would put the pendency between 5 and 8 years." (*Id.* at 1 (emphasis added).)

ESN will most certainly defend its rights vigorously during the IPR and, thus, the data showing an average pendency of appealed IPRs as 78.4 months (and growing every day) means that **Cisco is effectively asking to delay this action by six and a half years or more**.

In *Texas MP3 Tech.*, this Court recognized that an IPR would likely take three years plus the time for any appeals and found that such a delay would unfairly prejudice the plaintiff patentee. 2007 WL 3219372, at * 1. The more recently available statistics establish that ESN will suffer even greater delay and prejudice than was persuasive in *Texas MP3 Tech.*

Cisco appears to argue that the harm to ESN caused by the delay would be entirely reparable by money damages. However, the Supreme Court explicitly rebutted this consideration in its recent *eBay, Inc. v. MercExchange* decision, which recognized that individual inventors, such as ESN's Mr. Girard may be able to meet the test for an injunction, including establishing irreparable harm:

> some patent holders, such as university researchers or self-made inventors might reasonably prefer to license their patents, rather than undertake efforts to secure the financing necessary to bring their works to market themselves. Such patent holders may be able to satisfy the traditional four-factor test and we see no basis for categorically denying them the opportunity to do so.

547 U.S. at 393.[5] The stay requested by Cisco essentially eliminates ESN's right to exclusivity and effectively grants Cisco a compulsory license until at least 2016.

---

[5] Cisco's Senior Vice President and General Counsel, Mark Chandler, recognized this special treatment accorded to self-made inventors in his testimony before Congress. (Ex. C at 6.)

## 2. A Stay Would Create Tactical Disadvantages to ESN

In addition to causing the "fundamental harm of delaying final resolution," staying this case for an indefinite period of time threatens to prejudice ESN's ability to fairly prosecute its patent infringement action when the stay is finally lifted. *Biax*, 2007 U.S. Dist. LEXIS 12973, at *4. Courts have recognized that "crucial witnesses are more likely to be located if discovery is allowed to proceed now, rather than later." *Anascape,* 475 F. Supp. 2d at 617. Given the very real possibility that "witnesses may become unavailable, their memories may fade, and evidence may be lost while the PTO proceedings take place," ESN would be at a disadvantage if the case is stayed. *Gladish v. Tyco Toys, Inc.*, 1993 U.S. Dist. LEXIS 20211, at **5-6 (E.D. Cal. 1993).

Further, a District Court rather the Patent Office is the most appropriate forum to consider Cisco's invalidity defenses. Cisco's defenses presented in this lawsuit and in the IPR include numerous arguments that the claims of the '519 Patent are invalid under 35 U.S.C. 103 as being obvious. Any determination of obviousness *must* include an examination of the evidence of secondary considerations of non-obviousness. *Knoll Pharm. Co. v. Teca Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) ("The so-called 'objective' criteria must always be considered, *Graham v. John Deer Co.*, 383 U.S. 1, 17-18 (1966), and given whatever weight is warranted by the evidence presented.").

The secondary considerations of non-obviousness include, *inter alia*, (1) the commercial success of the claimed inventions, including the success of an infringer's products; (2) long-felt, but unsolved need for the invention and prior failed solutions; (3) copying of the inventions by the infringer; (4) praise for, professional approval of, and laudatory statements regarding the inventions; and (5) the infringer's attempt to obtain patents on the same or similar subject

matter.[6] Much of the evidence supporting these considerations would only be available through discovery of Cisco and/or third parties pursuant to the Federal Rules of Civil Procedure. Staying this action would prevent ESN from discovering critically relevant evidence from Cisco, including proof of infringement and financial data establishing the enormous commercial success of its infringing products, evidence of Cisco's prior failed products, and evidence that Cisco directly or indirectly copied Mr. Girard's inventions.

Additionally, the fact-intensive nature of the secondary considerations necessitates a fact finder with a scope of evaluation beyond that which is within the Patent Office's realm. *See U.S. Surgical Corp. v. Hosp. Prods. Int'l Pty.*, 701 F. Supp. 314, 337 n.24 (D. Conn. Dec. 2, 1988) *aff'd U.S. Surgical Corp. v. Hosp. Prods. Int'l Pty*, 914 F.2d 271 (Fed. Cir. 1990) (declining to defer to the PTO on secondary considerations, ". . . in light of the evidence on this record regarding secondary considerations or commercial success, the import of which may be understood without the benefit of any particular expertise, the Court does not defer to that portion of the reexamination decision.").

Thus, not only is this Court the best forum since it will provide a more timely resolution, it is the best forum for the factual development of the bases upon which the legal judgment of validity rests.[7] Denying ESN the best forum would operate as a severe tactical disadvantage.

### B. A Stay Would Not Simplify The Issues At Trial

Contrary to Cisco's assertions, there is no reason to believe that granting its motion will result in simplifying the issues at trial. Cisco's invalidity defense in this lawsuit relies on over

---

[6] *See, e.g., Graham*, 383 U.S. at 17-18; *National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.*, 254 F. Supp. 2d 527, 570 (E.D. Penn. 2003); *Mosinee Paper v. James River*, 1992 U.S. Dist. LEXIS 2425, at *15 (E.D. Wis. 1992).
[7] Indeed, ESN may seek to suspend the *inter partes* reexamination on these grounds. *See Sony Computer Entertainment America, Inc. v. Dudas*, 2006 U.S. Dist. Lexis 36856, *17-18 (E.D. Va. 2006) ("Congress has provided that the PTO may suspend *inter partes* review 'for good cause.' *See* 35 U.S.C. § 314. . . . the PTO has recognized . . . that concurrent litigation may provide good cause to suspend *inter partes* reexamination. *See* 37 C.F.R. § 1.987 ('If a patent in the process of *inter partes* reexamination is or becomes involved in litigation, the [PTO] shall determine whether or not to suspend the *inter partes* reexamination proceeding.')").

100 alleged prior art products. (*See* Ex. 2 at 5-7, Cisco's P.R. 3-3 Invalidity Contentions.) By statute, the IPR is limited to the review of the 13 prior art patents and printed publications asserted therein by Cisco. At trial, Cisco would be estopped from asserting the 13 patents and printed publications, but it will still attempt to make the same invalidity arguments based on the more than 100 additional alleged prior art products. It would be far more expeditious to consider the prior art at one time and in one forum.

Cisco cites the fact that its request for IPR has been granted by the Patent Office as if that fact alone indicates that the '519 Patent will ultimately be cancelled. To the contrary, "virtually all requests for *inter parties* reexamination are granted." (Ex. A at 1; *see also* Ex. S, USPTO Table 13B: Inter Partes Reexamination (FY 2003 – FY 2007) (in 2007, 118 of 119 IPR requests granted).) The fact that the Patent Office granted Cisco's request is meaningless in predicting the eventual outcome. (*See* Ex. A at 4 ("Whatever threshold has been established by the Patent Office for determining a "significant new question" [of patentability], few requestors have been unable to clear it.").)

Cisco also makes much of the fact that pursuant to its request for reexamination, the Patent Office rejected the claims of the '519 Patent. Predicting success and simplification of the case on this fact is naïve on Cisco's part. As seasoned practitioners are well aware, rejecting claims in a first office action is standard practice. *See NTP, Inc. v. Research In Motion, Ltd.*, 397 F. Supp.2d 785 (E.D. Va. Nov. 30, 2005) (denying a stay pending reexamination even though the asserted claims were rejected in the first office action).

Similarly, Cisco's assertion that it is "highly likely" that the IPR will result in the cancellation of all claims is not supported by the data. Cisco cites to data purporting to show that 57% of all patent claims subject to IPR are being invalidated. While this is a convenient statistic,

13

it is misleading.  This number is based on only 30 post-final office action proceedings.  A sample size of 30 is simply too small to be significant.  Indeed, the authors of the article cited by Cisco in its motion even admit that "this group of thirty proceedings still does not provide a large data set."  Shang & Chaikovsky, at 11.  Nor is this statistic probative of the outcome in *this* case.

Cisco further places great emphasis on the *number* of rejections made by the Patent Office without any discussion of the *merits* or *quality* of those rejections.  Cisco failed to inform the Court, however, that the Patent Office's rejections are duplicative, overlapping, and numerous primarily because they parrot Cisco's 500+ page reexamination request.  In its *first* Office Action, the Patent Office has adopted Cisco's factual assertions about the prior art without significant independent analysis.  This first volley should not be given any weight as an indicator of the outcome of the match.

In sum, the IPR would only eliminate a small fraction of the prior art issues raised by Cisco.  Cisco's hope that the '519 Patent will be entirely cancelled is purely "speculative and does not support a stay."  *Biax*, 2007 U.S. Dist. LEXIS 12973, at *5.

### C. The Stage of Litigation Does Not Favor A Stay

This case may be in its relatively early stages, but that fact in itself does not favor a stay. *See Sighting Sys. Inst., LLC v. Prestige Law Enforcement, Inc.*, U.S. Dist. LEXIS 64698, at *11 (N.D. Tex. Sept. 11, 2006) ("Although the advanced nature of a case approaching trial may weigh heavily against granting a stay, the opposite inference—that a suit in the early stages should weigh heavily in favor of a stay—is not true."); *see also Biax*, 2007 U.S. Dist. LEXIS 12973, at *6 (denying a stay where the case was in its early stages).  Any other rule would encourage patent infringers so obviously intent on gaming the patent system to secure an

indeterminately lengthy reprieve from accounting for their infringing activities simply by filing a quick request for reexamination with the Patent Office.

The Court has already set a detailed case schedule, including a *Markman* hearing in June 2009 and a trial date in April 2010. Notably, on April 16, 2008, six days prior to the April 22, 2008 Case Management Conference hearing, the Patent Office had already ordered Cisco's IPR to proceed. (Ex. T.) Nevertheless, Cisco did not at that time request a stay of the case. It appears that Cisco hoped to gain a tactical advantage by purposefully waiting to move for a stay until after ESN served its P.R. 3-1 and 3-2 Disclosures, including Infringement Contentions, and responses to a first set of Interrogatories.

To date, the parties have exchanged infringement and invalidity contentions as well as interrogatory answers. Discovery is well underway with over 20,000 pages of documents having been produced. While Cisco may believe "no significant resources have been expended," ESN and Mr. Girard, who do not have the multi-billion dollar resources of Cisco, feel otherwise.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff ESN respectfully asks the Court to deny Cisco's motion to stay this case pending reexamination of the '519 Patent.

Respectfully submitted,

 /s/ Peter J. McAndrews
George P. McAndrews
Thomas J. Wimbiscus
Peter J. McAndrews
Gerald C. Willis
McAndrews, Held & Malloy, Ltd.
500 West Madison, Suite 3400
Chicago, IL 60661
Telephone (312) 775-8000
Fax (312) 775-8100
pmcandrews@mcandrews-ip.com

Eric M. Albritton
Texas State Bar No. 00790215
Albritton Law Firm

P.O. Box 2649
Longview, Texas 75606
Telephone (903) 757-8449
Fax (903) 757-2323
ema@emafirm.com

T. John Ward Jr.
Texas State Bar No. 00794818
Ward & Smith Law Firm
111 West Tyler Street
Longview, Texas 75601
Telephone (903) 757-6400
Fax (903) 757-2323
jw@jwfirm.com

**Attorneys for Plaintiff ESN, LLC**

# CERTIFICATE OF SERVICE

I hereby certify that on the date this proof of service is signed below, I served the foregoing:

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO STAY PENDING REEXAMINATION**

via the Court's Electronic Filing System, on the following:

Charles K Verhoeven
Quinn Emanuel Urquhart Oliver & Hedges, LLP
50 California St., 22nd Floor
San Francisco, CA 94111
charlesverhoeven@quinnemanuel.com

Victoria F. Maroulis
Quinn Emanuel Urquhart Oliver & Hedges, LLP
555 Twin Dolphin Dr., Suite 560
Redwood Shores, CA 94065
victoriamaroulis@quinnemanuel.com

Sam Baxter
McKool Smith, P.C.
104 E. Houston Street, Suite 300
P.O. Box 0
Marshall, Texas 75670
sbaxter@mckoolsmith.com

Garrett W. Chambers
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
gchambers@mckoolsmith.com


Date: July 15, 2008                         _/s/ Peter J. McAndrews_____
                                            Peter J. McAndrews