IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| ESN, LLC, | § | |
|        Plaintiff, | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 5:08-CV-20 DF** |
| | § | |
| CISCO SYSTEMS, INC., and, | § | |
| CISCO-LINKSYS, LLC, | § | |
|        Defendants. | § | |

**O R D E R**

Before the Court is Defendants' Motion to Dismiss for Lack of Standing.  Dkt. No. 71.

Also before the Court are Plaintiff's response, Defendants' reply, and Plaintiff's sur-reply.  Dkt.

Nos. 106, 137, & 139, respectively.

Before the Court is Plaintiff's Motion to Disqualify Counsel and Impose Sanctions on

Defendants and their Counsel for Improperly Offering Financial Incentives in Exchange for

Testimony.  Dkt. No. 73.  Also before the Court are Plaintiff's response, Defendants' reply, and

Plaintiff's sur-reply.  Dkt. Nos. 85, 108, & 136, respectively.

The Court held a teleconference on May 11, 2009, and shortly thereafter the Court stayed

briefing on the above-mentioned motions until Plaintiff could complete discovery regarding

Defendants' motion to dismiss.  *See* 5/12/2009 Order, Dkt. No. 88.  These motions were then

fully briefed, and the Court held a hearing on November 20, 2009.  Having considered the

briefing, oral arguments of counsel, and all relevant papers and pleadings, the Court finds that

Defendants' motion to dismiss should be GRANTED and Plaintiff's motion to disqualify and for

sanctions should be GRANTED IN PART AS MODIFIED and DENIED IN PART.

# I.  BACKGROUND

Plaintiff brings suit alleging infringement of United States Patent No. 7,283,519 (the

"'519 Patent" or the "patent in suit"), which relates to Voice over Internet Protocol ("VoIP")

telephony and which names Gregory D. Girard as inventor.  *See* Complaint, Dkt. No. 1.  The

Court entered a Claim Construction Order on July 14, 2009.  Dkt. No. 102.  Fact discovery

closed on November 9, 2009, and this case was previously set for the Court's May 2010 trial

docket.  *See* 9/30/2009 Docket Control Order, Dkt. No. 141.  Expert discovery was previously set

to close on January 8, 2010.  *See id.*  The Court granted an agreed motion to stay this case until

60 days after resolution of the motions currently pending.  *See* 11/19/2009 Order, Dkt. No. 176.

# II.  THE PARTIES' POSITIONS

## A.  Motion to Dismiss for Lack of Standing

### (1) Defendants' Motion

Defendants move to dismiss for lack of subject matter jurisdiction, arguing that Mr.

Girard assigned his rights in the patent in suit to a non-party, Iperia, Inc. ("Iperia"), by way of an

employment agreement.  Dkt. No. 71 at 1.  In particular, Defendants submit that an assignment to

Iperia occurred *unless* Plaintiff can show *all* of the following: "(1) the invention did not relate to

Iperia's current or planned business, research or development; (2) the invention was made

without the use of Iperia's proprietary information; *and* (3) the invention was conceived and

made outside normal working hours."  *Id.*  Defendants argue that because Plaintiff "cannot show

that even one, let alone all three, of these requirements have been met, it cannot meet its burden

of establishing standing."  *Id.*

As to the invention's relationship to Iperia's business, Defendants submit that Iperia was

in the business of developing "advanced telecommunications products" and that Mr. Girard worked at Iperia to develop certain "Service Node" or "ActivEdge" products related to VoIP. *Id.* at 4 & 6. Defendants also submit that other patent applications filed by Mr. Girard while at Iperia were assigned to Iperia. *Id.* at 7. As to use of Iperia's proprietary information, Defendants submit that the provisional application to which the '519 Patent claims priority states on its face that it contains Iperia proprietary information and "defers to definitions" in another provisional patent application owned by Iperia. *Id.* at 23-24. As to whether the invention was conceived and made outside normal working hours, Defendants submit that Plaintiff cannot meet its burden because Mr. Girard does not recall when he developed the invention. *Id.* at 25.

As to whether the employment agreement at issue was in effect at the relevant time, Defendants argue that although the agreement expired, "the Employment Agreement expressly provide[d] that [Mr.] Girard's present assignment of any future inventions made during his employment survived termination of the Employment Agreement." *Id.* Defendants argue that the agreement thereby effected a "*present* assignment of a future right." *Id.* at 26. Alternatively, Defendants argue that "[e]ven in the absence of a written employment agreement, title to the '519 Patent would have transferred to Iperia by virtue of Girard's status as an employee 'hired to invent' and his fiduciary duties to Iperia as a corporate officer." *Id.* at 2 and 27-30.

Defendants purportedly obtained title to the '519 Patent from Iperia such that, Defendants argue, Plaintiff has no title and therefore no standing to bring suit. *Id.* at 12.

<u>(2) Plaintiff's Response</u>

Plaintiff responds that Iperia's business related to "voicemail, e-mail, and other messaging services" and that by March of 2000, before development of the invention at issue,

"Mr. Girard's focus was on commercialization and sales of Iperia's software products," not product development.  Dkt. No. 106 at 4-5.  Plaintiff submits that Mr. Girard's Employment Agreement "allow[ed] independent inventive work" and that, during his spare time starting "at approximately the end of 2000," he "conceived of, and worked on, the subject matter of his Provisional Application on his computer workstation at home."  *Id.* at 7.  Plaintiff submits declarations from Mr. Girard, as well as from Richard Connaughton, Iperia's Chief Executive Officer at the time of the invention at issue, declaring that Iperia had itself acknowledged that: (1) Mr. Girard's invention was not related to Iperia's business; (2) Messrs. Girard and Connaughton discussed the invention in detail; and (3) they agreed that Iperia did not own the invention.  *See id.* at 8-11 and 19.  Plaintiff also proposes that if Iperia had thought the invention at issue was related to Iperia's business, Iperia would have retained a license.  *Id.* at 20.  Plaintiff argues that Defendants characterize Iperia's business too broadly.  *Id.* at 21.

As to alleged use of Iperia proprietary information, Plaintiff submits that the subject matter of the Iperia provisional application cited by Mr. Girard's provisional application, to which the '519 Patent claims priority, "was *not* confidential at the time [Mr.] Girard invented the subject matter of his Provisional Application."  *Id.* at 14.  As to whether the invention was made during normal working hours, Plaintiff submits that "Mr. Girard did not work 9 to 5 for Iperia" and that his "work for Iperia was always done on an ad hoc basis where he scheduled his time according to the projects he was working on."  *Id.* at 14 (citations omitted).  Plaintiff argues that the term "normal working hours" must be interpreted in light of the variable nature of Mr. Girard's work.  *Id.* at 24-25.  Also, Plaintiff submits that near the time of the invention, Mr. Girard and Iperia agreed that the invention was made outside of normal working hours, at least

because "[Mr.] Girard reliably fulfilled his work duties to the company." *Id.* at 25.  Plaintiff

further submits that "[n]one of [Mr.] Girard's work on his independent invention was performed

on Iperia's premises, nor did [Mr.] Girard use Iperia's tools, devices, or equipment." *Id.*

As to applicability of the Employment Agreement, Plaintiff argues that the agreement

"defined the respective intellectual property rights of the parties, thereby superseding any alleged

obligations [Mr.] Girard had under common law doctrines." *Id.* at 20; *see also id.* at 26.  Plaintiff

also argues that Defendants, not Plaintiff, have the burden of proving that any common law

doctrine of assignment of an invention is applicable and satisfied.  *Id.* at 26 (citing Chisum on

Patents, § 22.03[2] ("The burden of proof is on the employer who claims ownership through an

employment to invent.")).  Plaintiff further argues that the employment to invent must be

specific, that Mr. Girard's title of "Chief Technology Officer" is not specific enough, and that

Mr. Girard did not have technical development responsibilities at the time of the invention at

issue. *Id.* at 27.  As to Defendants' arguments that the '519 Patent was constructively assigned to

Iperia as a result of Mr. Girard's alleged breaches of fiduciary duty, Plaintiff argues: (1) Mr.

Girard did not have fiduciary responsibilities at the relevant time; (2) Mr. Girard did not breach

any responsibilities because he had "open and forthright discussions regarding his plans with

Iperia's CEO and Chairperson"; and (3) any claim for breach of fiduciary duty is barred by the

three-year statute of limitations. *Id.* at 28.  As to equitable considerations, Plaintiff submits that

to whatever extent the Court finds Mr. Girard had an obligation to assign the invention at issue to

Iperia, Mr. Girard and Iperia released such obligations by oral modification.  *Id.* at 29-30.

Plaintiff also submits that equity weighs in its favor because Mr. Girard delayed his departure

from Iperia after Mr. Connaughton expressed desire for Mr. Girard to stay during a period when

5

Iperia was attempting to raise funds.  *Id.* at 30.

Plaintiff also cites its co-pending Motion to Disqualify Counsel and argues that "[n]ow that all of the individuals with direct knowledge of [Mr.] Girard's employment relationship with Iperia are long gone from Iperia" and "now that [Defendants] ha[ve] paid Iperia" and will purportedly pay more contingent on Iperia's continued assistance, "the new individuals running Iperia hope to re-write the history of the ownership of the '519 Patent."  *Id.* at 16.

(3) Defendants' Reply

In reply, Defendants argue that Plaintiff relies on self-serving declarations from Mr. Girard and from Richard Connaughton, who Defendants argue is a close personal friend of Mr. Girard's father.  Dkt. No. 137 at 1 and 14.  Defendants also submit that Mr. Girard's detailed declaration regarding conversations with Mr. Connaughton is undermined by Mr. Girard's failure to recall any such details during his deposition.  *Id.* at 1-2 and 15.  Defendants also emphasize that Plaintiff has the burden of asserting standing.  *Id.* at 2.

As to whether Mr. Girard's invention was related to Iperia's business, Defendants argue that the '519 Patent on its face is related to Iperia's "enhanced services platforms" or "application servers," which the '519 Patent discloses using.  *Id.* at 3.  Defendants also argue that "the parties' dispute in this case focuses on the SIP [(Session Initiation Protocol)] -related *software* [Mr.] Girard claimed in the '519 Patent," but regardless, Iperia's business was also related to hardware products and to VoIP networks generally.  *Id.* at 3-4.  For example, Defendants submit that "[i]t was [Mr.] Girard's job to research these related products and study ways in which Iperia and its products could work with them more effectively."  *Id.* at 4.  Defendants cite documents purportedly indicating that while Mr. Girard was at Iperia, "Iperia was interested in developing

new products, including its own 'standards-based hardware platform,' new 'network interfaces,'

and various 'next-generation technologies.'"  *Id.* at 6 (citations omitted).  Defendants also cite a

patent application filed by Mr. Girard on behalf of Iperia entitled "Apparatus and Method for

Telephony Service Interface to Software Switch Controller," abbreviated by Defendants as the

"SIP-TSI" invention or application, which Defendants argue related to Iperia's efforts to deploy

SIP in its products and recognized "edge switches" as disclosed in the '519 Patent.  *Id.* at 6.

 As to Mr. Connaughton's declaration that Iperia did not believe Mr. Girard's invention

was covered by the Employment Agreement, Defendants distinguish Plaintiff's authority by

arguing that "[Mr. Connaughton] never received a full disclosure of [Mr.] Girard's invention,"

that "[Mr.] Connaughton never reviewed [Mr.] Girard's entire Inventor's Notebook and could

not evaluate Iperia's rights even if he did so," and that Mr. Girard failed to provide Iperia with a

copy of his patent application.  *Id.* at 12-13 (discussing *DDB Techs., LLC. v. MLB Advanced*

*Media, L.P.*, No. A-04-CA-352-LY, at *12-19 (W.D. Tex. Aug. 18, 2009) (slip op.), attached as

Smith Ex. 38, and arguing that in *DDB Technologies*, the employee's invention had been

completely disclosed, the invention had been reviewed by two intellectual property attorneys and

a laboratory director, and the employee also disclosed the patent application).

 As to whether Mr. Girard's invention was based on Iperia confidential information,

Defendants argue that the SIP-TSI application was indeed confidential, contrary to Plaintiff's

argument, because the public document cited by Plaintiff "was a condensed version of the SIP-

TSI Provisional Application that omitted descriptions of network elements that the '519

Provisional Application relies upon."  *Id.* at 8.  As to whether Mr. Girard made his invention

during normal working hours, Defendants reply that Mr. Girard performed research and

development for Iperia while in his "home lab," so Plaintiff cannot simply argue that Mr. Girard made his invention outside of normal working hours merely because he made his invention at home.  *Id.* at 9.  Defendants reiterate that because Mr. Girard testified in deposition that he could not recall when he conceived of his invention, Plaintiff cannot meet its burden of showing that the invention was made outside of normal working hours.  *Id.* at 10.

Defendants also argue that any purported oral modification is irrelevant because the assignment effected by Mr. Girard's Employment Agreement occurred "automatically and immediately when [Mr.] Girard made his invention," so any subsequent assignment had to be in writing pursuant to 35 U.S.C. § 261.  *Id.* at 10.

(4) Plaintiff's Sur-Reply

In sur-reply, Plaintiff argues that Defendants' attempts to distinguish *DDB Technologies* fail because the employment agreement at issue in that case required that the employee disclose "a complete record" rather than simply make "full and prompt disclosure."  Dkt. No. 139 at 2 (discussing *DBS Techs.*, No. A-04-CA-352-LY at *2).  Plaintiff emphasizes the proposition in *DDB Technologies* that the term "related to" is ambiguous and that evidence of the understanding of the parties at the relevant time is the "best evidence of the true meaning of the provision."  Dkt. No. 139 at 4.  Plaintiff also argues that "[Mr.] Girard provided several pages of testimony about the Employment Agreement and about what he discussed in relation to that agreement with [Mr.] Connaughton."  *Id.*  Plaintiff also submits that Defendants obtained the Employment Agreement from Iperia three days *before* Mr. Girard's deposition but did not produce it to Plaintiff until one month *after* the deposition, thereby "prevent[ing Mr.] Girard from refreshing his recollection prior to and during the deposition."  *Id.* at 5.  Plaintiff argues that

Defendants' tactics in this regard are particularly unfair because Plaintiff had outstanding

subpoenas and discovery requests as to both Iperia and Defendants for all documents relating to

Mr. Girard.  *Id.* at 8-9.

**B.  Plaintiff's Motion to Disqualify Counsel and for Sanctions**

(1) Plaintiff's Motion

The same day that Defendants moved to dismiss, Plaintiff moved to disqualify

Defendants' counsel and to impose sanctions.  *See* Dkt. No. 73.  Plaintiff argues that Defendants

and their counsel agreed to pay $500,000 to Iperia, pursuant to a "Patent Assignment

Agreement," in exchange for its cooperation and its favorable testimony in connection with

Defendants' motion to dismiss for lack of subject matter jurisdiction.  *Id.* at 1.  Plaintiff also cites

alleged defamatory statements by Defendants about Plaintiff and its counsel, as well as a

"voluntary dismissal and a 90-day stand down" during which Defendants' prepared an *inter*

*partes* reexamination request "as a pretext to stay this case."  *Id.*

Plaintiff presents various alleged improprieties regarding Defendants interaction with

Iperia.  For example, Plaintiff submits that after Iperia failed to timely respond to a subpoena for

documents relating to Mr. Girard, Defendants obtained documents from Iperia but failed to notify

Plaintiff, despite Plaintiff's inquiries.  *Id.* at 2-4.

As to the purportedly improper and unethical agreement between Defendants and Iperia,

Plaintiff submits that it discovered this agreement "quietly slipped into a mountain of unrelated

. . . production [by Defendants]."  *Id.* at 5.  Plaintiff argues that "Iperia has become [Defendants']

evidentiary puppet with over a quarter of a million dollars worth of strings attached," and that

this purported "bribe," including the $200,000 "'kicker' that is contingent on [Defendants']

9

successful assertion of patent ownership," has "irreversibly tainted any testimony or evidence that could have been provided by Iperia." Dkt. No. 73 at 7.  Plaintiff submits case law, a criminal statute, and rules of professional conduct regarding the impropriety of paying a witness contingent on the content of the witness's testimony.  *Id.* at 8-9 (citing *New York v. Solvent Chem. Co., Inc.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996), *Hamilton v. General Motors Corp.*, 490 F.2d 223, 228 (7th Cir. 1973), 18 U.S.C. § 201(c)(2), ABA Model Rules of Prof'l Conduct R. 3.4 cmt. (2004), Cal. Rule of Prof'l Conduct 5-310, Mass. Rule of Prof'l Conduct 3.4(g), and ABA Model Code of Professional Responsibility Disciplinary Rule 7-109 and Ethical Consideration 7-28).

Plaintiff further argues that disqualification of Defendants' trial counsel, as well as in-house counsel directly involved in the alleged misconduct, is the appropriate remedy for improper payment of witnesses.  *Id.* at 10 (citations omitted).

As to sanctions, Plaintiff requests that the Patent Assignment Agreement be found "void as being an illegal bribe, or at the very least, against public policy," and that both Defendants and Iperia be prohibited from arguing "that Iperia should have received assignment of the '519 Patent."  *Id.* at 12.  Plaintiff also argues that Defendants have "unclean hands" and should be barred from raising any equitable defenses in this case.  *Id.* at 12-13.  Plaintiff also requests that the Patent Assignment Agreement, related communications between Defendants and Iperia, and Plaintiff's present Motion to Disqualify be made public.  *Id.* at 13.  Alternatively, Plaintiff requests that the Court permit modification of the Protective Order (Dkt. No. 34) "to allow such materials to be submitted to the relevant state bar disciplinary commissions."  *Id.* at 14.  Finally, Plaintiff requests its "attorneys fees and expenses in bringing this motion as well as expenses

incurred because of [Defendants'] frustration of [Plaintiff's] discovery efforts directed toward Iperia." *Id.*

    (2) Defendants' Response

        Defendants respond that they obtained documents from Iperia showing an assignment of Mr. Girard's purported invention to Iperia and that Defendants properly purchased any related patent rights from Iperia. Dkt. No. 85 at 1. Defendants submit that they and Iperia "recognized that the value of Iperia's title would depend on whether or not [the '519 Patent] could withstand [Plaintiff's] inevitable challenge," and that Defendants and Iperia "structured the Assignment to reflect this uncertainty by providing for an additional payment in the event that a court confirmed that [Defendants] had acquired title." *Id.* at 2. Defendants argue that such an agreement is proper under relevant authorities, such as *Ethicon, Inc., v. United States Surgical Corp.*, 135 F.3d 1456 (Fed. Cir. 1998). *Id.* at 3. For example, Defendants argue that "agreements to cooperate in litigation and contingent payment agreements are common in intellectual property transactions." *Id.* at 4. Defendants urge that they have purchased an asset, not testimony. *Id.* at 7. Defendants also argue that one of Plaintiff's trial counsel, who prosecuted the '519 Patent and is likely to be called as a trial witness, has an improper contingent financial interest in the outcome of the case, at least by Plaintiff's proposed standard. *Id.* at 6-7. Defendants further argue that Plaintiff's allegations of discovery failings by Defendants are "untrue and irrelevant," and Defendants submit that Plaintiff is not seeking relief under any discovery rule. *Id.* at 8-10.

        Finally, Defendants argue that Plaintiff's requested remedies are inappropriate. *Id.* at 10-15. In particular, Defendants argue that "[d]isqualification is not appropriate because [Plaintiff] cannot demonstrate prejudice," that "exclusion of evidence that the Court lacks subject matter

jurisdiction is never a permissible sanction," and that "a witness's pecuniary interest in the

outcome of a case goes to the probative weight of testimony, not its admissibility." *Id.* at 11 and

13 (citations and quotations omitted).  As to barring defenses, Defendants argue that "'unclean

hands' can only bar an equitable defense when the misconduct is connected to the defense in

question." *Id.* at 13.  As to waiver of privilege or modification of the protective order,

Defendants argue that the "crime-fraud exception" is inapplicable and that Defendants have not

attempted to conceal the Assignment. *Id.* at 14-15.

> (3) Plaintiff's Reply

In reply, Plaintiff argues that additional discovery permitted by this Court has confirmed

that the Patent Assignment Agreement "is a sham intended to purchase a purported defense for

[Defendants]" and that Defendants "seized the opportunity to take advantage of Iperia's financial

situation in order to craft [Defendants'] ownership defense."  Dkt. No. 108 at 1 and 3.

Plaintiff argues that the *Ethicon* decision relied upon by Defendants is inapplicable.

Plaintiff argues that because this Court should apply the law of the Fifth Circuit Court of

Appeals, the *Ethicon* decision by the Federal Circuit Court of Appeals, which applied the law of

the Second Circuit Court of Appeals, is not binding on this Court. *Id.* at 3.  Plaintiff also argues

that *Ethicon* is factually distinguishable as involving an agreement that required assistance of an

inventor—not a former employer—and that provided for payment of royalties rather than a

"naked payment" for achievement of a favorable ruling. *Id.* at 4.  Plaintiff also urges that

Defendants did not merely purchase an asset but rather provided for payment in exchange for

assistance and testimony that results in a favorable ruling. *Id.* at 5.  Plaintiff further argues that

unlike *Ethicon*, the agreement at issue has led to "discovery misconduct and questionable

testimony." *Id.*

Plaintiff also argues that the Patent Assignment Agreement has "taint[ed] the record." *Id.*
at 6.  Plaintiff argues that Iperia was originally uncertain about ownership of the '519 Patent but
that as a result of the Patent Assignment Agreement, Iperia now contends it has been confident in
its ownership.  *Id.* at 7.  Plaintiff also alleges that Defendants' have controlled Iperia's document
production, such as by obtaining "unlimited and unsupervised access to Iperia's documents"
despite an outstanding subpoena from Plaintiff to Iperia.  *Id.* at 8.  Further, Plaintiff again
emphasizes that Defendants' counsel had Mr. Girard's Employment Agreement three days prior
to Mr. Girard's deposition but failed to timely produce that agreement to Plaintiff, even though
Plaintiff had outstanding discovery requests.  *Id.*  Plaintiff also notes that Defendants agreed to
pay all of Iperia's attorney's fees relating to this case.  *Id.* at 9.  Finally, Plaintiff argues that
because "Iperia was desperate for money," Defendants were in control of the terms of the Patent
Assignment Agreement and dictated terms such as "the assistance clause (section 3.2)," the
"progress payments," and the "Final Payment of $200,000, based upon Defendants' obtaining a
'Favorable Court Ruling.'"  *Id.* at 10-11.

(4) Defendants' Sur-Reply

In sur-reply, Defendants argue that the *St. Clair* case cited by Plaintiff is distinguishable
because the agreement at issue was withheld until trial and because payments were expressly
linked to litigation assistance and not the patent rights being acquired.  Dkt. No. 136 at 1-2
(discussing *St. Clair Intellectual Property Consultants v. Canon, Inc.*, No. 03-241 JJF (D. Del.
Nov. 17, 2005), Dkt. No. 108 at Ex. S).  Defendants reiterate that the *Ethicon* decision is
applicable.  *Id.*  Defendants also argue that Plaintiff's own conduct "runs afoul of its untenably

strict interpretation of the [attorney] disciplinary rules," including that one of Plaintiff's trial counsel is a likely fact witness and that Plaintiff and its members have agreed to testify favorably as part of agreements raising working capital. *Id.* at 2-3. As to alleged discovery misconduct, Defendants reply that Plaintiff "has not provided any evidence whatsoever that [Defendants] destroyed, modified or falsely created any Iperia documents." *Id.* at 4. Defendants also submit that Plaintiff has taken plenty of discovery regarding Defendants' motion to dismiss, including two document subpoenas to Iperia, depositions of all principals of Iperia, depositions of Defendants' in-house and trial counsel, and documents subpoenas to Defendants' trial counsel. *Id.* at 4.

As to Mr. Girard's Employment Agreement, Defendants argue that Plaintiff was not "prejudiced by [Defendants'] month-long delay" in production and that "Mr. Girard initiated discussion of the agreement at his deposition." *Id.* at 5. Defendants argue that they were "under no obligation to provide a hostile witness with a particular document [Plaintiff] claims would have refreshed [Mr. Girard's] recollection, especially where that witness testified about the document from memory." *Id.* Regarding diligence of Defendants and Iperia in investigating Iperia's purported rights in the '519 Patent, Defendants argue that such diligence is irrelevant, but regardless: Iperia's CEO evaluated the Employment Agreement and the '519 Patent; Iperia obtained two opinions of counsel; and Defendants deposed Mr. Girard and contacted Mr. Connaughton, "neither of whom provided evidence sufficient to overcome the evidence establishing Iperia's ownership of the '519 Patent." *Id.* (citations omitted).

Defendants also refer back to arguments in their response that Plaintiff cannot show it is entitled to the remedies it seeks. *Id.* at 5-6. Defendants submit that Plaintiff has failed to rebut

14

Defendants' arguments in this regard.  *Id.* at 6.

## III.  DISCUSSION

### A.  Motion to Dismiss for Lack of Standing

<u>(1) Legal Principles</u>

"The burden of demonstrating standing falls to [Plaintiff], as '[i]t is well established . . .

that before a federal court can consider the merits of a legal claim, the person seeking to invoke

the jurisdiction of the court must establish the requisite standing to sue.'"  *Ortho Pharm. Corp. v.*

*Genetics Inst., Inc.*, 52 F.3d 1026 (Fed. Cir. 1995) (quoting *Whitmore v. Arkansas*, 495 U.S. 149,

154 (1990)).  One seeking damages for infringement of a patent must hold legal title to that

patent.  *See, e.g., Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995).  A

party without title has no standing to bring suit.  *See Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d

1568, 1572 (Fed. Cir. 1991).  "[P]atent ownership is determined by state, not federal law."  *Sky*

*Techs. LLC v. SAP AG*, 576 F.3d 1374 (Fed. Cir. 2009).

"In examining a [Federal Rule of Civil Procedure ("Rule")] 12(b)(1) motion, the Court is

empowered to consider matters of fact which may be in dispute."  *DDB Techs., LLC v. MLB*

*Advanced Media, LP*, 465 F. Supp. 2d 657, 661 (W.D. Tex. 2006).

> A motion to dismiss for want of subject matter jurisdiction can take the form of a
> facial attack on the complaint, requiring the court merely to assess whether the
> plaintiff has alleged a sufficient basis of subject matter jurisdiction, taking all
> allegations in the complaint as true. . . . A factual attack on the subject matter
> jurisdiction of the court, however, challenges the facts on which jurisdiction
> depends[,] and matters outside of the pleadings, such as affidavits and testimony,
> are considered.

*Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir. 1981) (citations omitted).  Defendants have

evidently made a "factual attack," and the Court must therefore resolve factual disputes relating

to subject matter jurisdiction:

> If a defendant makes a "factual attack" upon the court's subject matter jurisdiction over the lawsuit, the defendant submits affidavits, testimony, or other evidentiary materials.  In the latter case a plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction.

*Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).

(2) Analysis

Mr. Girard signed an Employment Agreement with Visual Telesystems, Inc. on April 17, 1997.  Dkt. No. 106 at Ex. 3.  Visual Telesystems, Inc., founded in 1997, later changed its name to Iperia, Inc.  *See* Connaughton Decl., Dkt. No. 109 at ¶ 5; *see also* Girard Decl., Dkt. No. 107 at ¶ 4; Certificate of Amendment, Dkt. No. 72 at Waicberg Ex. 6.  The agreement specifies that it "shall be construed, interpreted and enforced in accordance with the laws of the Commonwealth of Massachusetts."  Dkt. No. 106, Ex. 3 at § 11.

The Employment Agreement provided as follows, in relevant part, regarding disclosure and assignment of inventions:

> 5.3     Survival.  The provisions of Section 6 shall survive the termination of this Agreement.
>
> 6.     Proprietary Information and Developments.
>
> 6.1     Proprietary Information.
>
> (a) Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company.  By way of illustration, but not limitation, Proprietary Information may include inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, financial data, personnel data,

computer programs, and customer and supplier lists.  Employee will not disclose any Proprietary Information to others outside the Company or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after his employment, unless and until such Proprietary Information had become public knowledge without fault by the Employee.

. . .

6.2    Developments.

(a) Employee will make full and prompt disclosure to the Company of all inventions, improvements, discoveries, methods, developments, software, and works of authorship, whether patentable or not, which are created, made, conceived or reduced to practice by the Employee or under his direction or jointly with others during his employment by the Company, whether or not during normal working hours or on the premises of the Company (all of which are collectively referred to in this Agreement as "Developments").

(b) Employee agrees to assign and does hereby assign to the Company (or any person or entity designated by the Company) all his right, title and interest in and to all Developments and all related patents, patent applications, copyrights and copyright applications.  However, this Section 6(b) shall not apply to Developments which do not *relate* to the present or planned business or research and development of the Company and which are made and conceived by the Employee not during normal working hours, not on the Company's premises and not using the Company's tools, devices, equipment or Proprietary Information.

Dkt. No. 106 at Ex. 3 (emphasis added).  Mr. Girard signed this agreement both on behalf of himself as "Employee" and on behalf of his employer as "Chief Scientist."  *See id.*  Mr. Girard thus apparently negotiated the Employment Agreement with himself.  Also, section 6.2(b) of the agreement excludes from assignment "Developments which do not *relate* to the present or planned business or research and development of the Company."  *Id.* (emphasis added).  Mr. Girard did not agree to assign only Developments that were "closely" related, "substantially" related, or "significantly" related.  Instead, Mr. Girard agreed that all Developments that merely "relate" would be subject to assignment.  Similarly, Mr. Girard agreed to broad language

17

regarding what the Developments had to be "relate[d]" to, namely "the present or planned business or research and development of the Company." *See id.* This broad, self-negotiated drafting weighs in favor of construing the assignment provisions broadly.

Defendants argue that the application that led to the '519 Patent was subject to automatic assignment to Iperia pursuant to the Employment Agreement. Defendants submit that Mr. Girard did not meet any of the three criteria required to avoid an automatic assignment: (1) the invention not being "relate[d]" to Iperia's business; (2) the invention not being made "during normal working hours"; and (3) the invention not being made on Iperia's premises, using Iperia's tools, or using Iperia's "Proprietary Information." *See* Dkt. No. 106, Ex. 3 at § 6.2(b). Failure to satisfy any one of these criteria results in automatic assignment. These criteria are ambiguous, however, at least because the Employment Agreement does not outline Iperia's "business or research and development" or establish "normal working hours." *See Bank v. Thermo Elemental, Inc.*, 451 Mass. 638, 648 (2009) ("To answer the ambiguity question, the court must first examine the language of the contract by itself, independent of extrinsic evidence concerning the drafting history or the intention of the parties") (citation omitted). The Court therefore considers extrinsic evidence to ascertain the true meaning of the agreement. *City of Haverhill v. George Brox, Inc.*, 716 N.E.2d 138, 141 (Mass. App. Ct. 1999) ("Where the terms of an instrument are ambiguous, a court must determine meaning from the intent of the parties upon consideration of the words in question, the entire instrument, and surrounding circumstances.") (citation omitted); *see also Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000).

*First,* as to relatedness, the '519 Patent claims priority to "U.S. provisional application 60/283,888 [(the "'888 application")] filed on Apr. 13, 2001 . . . ." Dkt. No. 74, Smith Ex. 11 at

1:7-9.  Mr. Girard testified that he was employed at Iperia at the time he filed the '888

application, having not departed until about August or September of 2001.  Dkt. No. 74, Smith

Ex. 3 at 69:1-4 and 75:15-18; Dkt. No. 107 at ¶ 3.  The '888 application references another

provisional patent application, numbered "60/185[,]549," filed February 28, 2000 (the "'549

application"):

> NOTE: System element definitions will defer to definitions found in U.S. Patent
> Application titled "*Apparatus and Method for Telephony Service Interface to
> Software Switch Controller*" (Girard, Gregory D., U.S. and foreign patents
> pending Jan. 2000, serial #60/185[,]549).  In the text below, certain references to
> this body of work may be referenced using the abreviation [*sic*] "SIP-TSI."

Dkt. No. 74, Smith Ex. 12 at 5 of 21.  The '549 application, assigned to Iperia, is also sometimes

referred to as the "SIP-TSI provisional application."  Another application assigned to Iperia, U.S.

Patent Application No. 09/796,934 (the '934 application), is a non-provisional application filed

February 28, 2001, that claims priority to the '549 provisional application.  Dkt. No. 74, Smith

Ex. 11 at [0001].  The '934 application published as U.S. Patent Publication No. 2001/0036176.

*See id.*  Because Mr. Girard referred to the SIP-TSI provisional application in his '888

application, and because the SIP-TSI applications were filed on behalf of Iperia, presumably in

furtherance of Iperia's business, the Court considers these SIP-TSI applications in assessing

whether Mr. Girard's '888 application (that issued as the '519 patent in suit) was related to

Iperia's business.

The '888 application refers to the SIP-TSI applications for "system element definitions."

Dkt. No. 74, Smith Ex. 12 at 5 of 21.  Iperia's SIP-TSI applications (the '549 application and the

'934 application) and the '519 Patent disclose providing enhanced VoIP voice services using: an

Application Server (Dkt. No. 74, Smith Ex. 10 at 2 & 14 and Ex. 11 at [0003]-[0004]; Dkt. No.

106, Ex. 1 at 13:30-14:35), a Media Gateway (Dkt. No. 74, Smith Ex. 10 at 12-13 and Ex. 11 at
[0057]-[0058]; Dkt. No. 106, Ex. 1 at 2:55-66 & 3:15-29), the SIP protocol (Dkt. No. 74, Smith
Ex. 10 *passim* and Ex. 11 at [0009]; Dkt. No. 106, Ex. 1 *passim*), the use of SIP User Agents
(Dkt. No. 74, Smith Ex. 10 at 14-28 and Ex. 11 at [0041]-[0042]; Dkt. No. 106, Ex. 1 at
25:10-22 & 47:55-48:3), and the use of "RTP" protocol (Dkt. No. 74, Smith Ex. 10 at 10 and Ex.
11 at [0078]-[0079]; Dkt. No. 106, Ex. 1 at 24:15-23).

The '519 Patent does differ from the SIP-TSI applications in significant aspects. For
example, the '934 application discloses that "[a] MEDIA GATEWAY does not contain all of the
logic necessary to route calls or invoke subscriber services." Dkt. No. 74, Smith Ex. 11 at
[0126]. By contrast, the Edge Switch of the '519 Patent, while "centrally managed" for some
purposes such as loading software and collecting billing information, is designed to "connect
telephone calls and deliver telephone features in the most localized manner possible with
minimal assistance from carrier network elements." Dkt. No. 106, Ex. 1 at 40:1-3; *see also*
15:10-26. But Mr. Girard's Employment Agreement automatically assigned all inventions that
were "related," not merely those that completely overlapped with Iperia's business. *See* Dkt. No.
106, Ex. 3 at § 6.2(b). Thus, analysis of Plaintiff's standing primarily turns on the similarities,
despite the differences.[1]

As to Iperia's business documents, some portions indicate that Iperia's business was
limited to providing voicemail and messaging services software. For example, a February 2001

---

[1] *Cf. Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, No. 2008-1269, -1270, 2009 WL
4546935, at *2 (Fed. Cir. Dec. 7, 2009) (regarding phrase "related to pending litigation," noting that: "In general,
'related to' means one thing has some relationship or connection to another thing. . . . In legal parlance, 'related'
takes meanings with similar breadth. *See* Black's Law Dictionary 1288 (6th ed. 1991) (defining 'related' as
'[s]tanding in relation; connected; allied; akin') . . . . In many patent contexts, the term 'related' adopts a similarly
encompassing meaning.") (citations omitted).

proposal drafted in response to a customer request focuses on Iperia's "experience" in "(1) voice,

fax and e-mail messaging services, (2) unified messaging services, and (3) enhanced e-mail

services."  Voicemail and Unified Messaging Response for XO Communications, Dkt. No. 72,

Waicberg Ex. 5 at IPERIA0006150.[2]  The applications discussed in this proposal relate to

ActivEdge Business Voicemail, for providing "a rich voicemail feature set," and ActivEdge

Unified Messaging, for providing "basic call answering functionality integrated with Web-based

access for mailbox manipulation and enhanced notification options."  *Id.* at IPERIA0006150-51.

Also, Appendix E to the proposal, which describes Iperia's ActivEdge Enhanced Communication

System (ActivEdge ECS) more generally, describes an application server for *central* equipment.

*See id.* at IPERIA0006350-61.  Claims of the '519 Patent, by contrast, are directed to *end-user*

deployment.  *See* Dkt. No. 106, Ex. 1 at Claim 13 ("rout[ing] telephone calls in a peer-to-peer

fashion").

　　　　But other portions of the business documents indicate a relatively broad scope for Iperia's

business, a scope that overlaps with the '519 Patent in suit.  Appendix E to the proposal

discussed above indicates that Iperia's business included both hardware and software, such as for

interfacing with the Public Switched Telephone Network ("PSTN"), which Appendix E describes

as a "legacy" network.  *See, e.g.,* Dkt. No. 72, Waicberg Ex. 5 at IPERIA0006531.  Claims of the

'519 Patent, by comparison, are directed to interfacing with legacy "non-SIP" telephones, such as

on a subscriber's premises.  *See* Dkt. No. 106, Ex. 1 at Claim 9.  Appendix E also describes use

of a distributed "Media Gateway" that, although controlled by a centralized "softswitch,"

---

[2]  *See also* 4/18/2001 Response to Unified Messaging Voicemail Requirements for WorldCom, Dkt. No. 72, Waicberg Ex. 12.

provides connectivity with networks such as the PSTN or a VoIP network, such as the Internet. Dkt. No. 72, Waicberg Ex. 5 at IPERIA0006535 & Fig. 2.  Although the Edge Switch described in the '519 Patent operates in a more decentralized, "peer-to-peer" fashion, the Edge Switch nonetheless appears to be a fairly close relative of the Media Gateway.  *See, e.g.,* Dkt. No. 106, Ex. 1 at 37:29-32 ("Edge Switch [1] / DES system element that is a hardware device used to terminate IP-based voice, video, and data broadband network service at the network subscriber (customer) premise.")

Also, a federal trademark registration filed by Iperia in early 2001 lists areas of use that include "computer programs for use in storing, retrieving and transmitting messages comprising voice, data, images, video and text over public telephone networks, wireless telephone networks and local, national and global information networks."  Dkt. No. 72, Waicberg Ex. 3.  Iperia seemingly characterized its business as nearly any use of computer programs in the general field of telecommunications.

Mr. Girard and Mr. Connaughton (Iperia's former CEO) have both declared that in late April or early May of 2001, shortly after Mr. Girard filed his '888 application, they discussed the subject matter of that application.  Dkt. No. 109 at ¶ 11; *see also* Dkt. No. 107 at ¶ 8.  Mr. Connaughton recalls that they "agreed that Iperia did not own Mr. Girard's provisional patent application and/or the inventions described in Mr. Girard's invention."  Dkt. No. 109 at ¶¶ 15-19. This assessment in 2001 bears on whether Mr. Girard's invention "relate[d]" to Iperia's business pursuant to the Employment Agreement.  *See* Dkt. No. 106, Ex. 3 at § 6.2(b); *City of Haverhill*, 716 N.E.2d at 141 ("Where the terms of an instrument are ambiguous," court can consider "surrounding circumstances.").  On balance, though, this assessment by Messrs. Girard and

Connaughton does not override the weight of the evidence to the contrary, discussed above. Further, this assessment in 2001 occurred four years after Mr. Girard signed the Employment Agreement in 1997 and is therefore of limited interpretive weight.

Finally, Messrs. Girard and Connaughton did not reduce to writing any purported agreement about the '888 application. Because the Employment Agreement effected an automatic assignment to Iperia, Mr. Girard could not have obtained rights to the '888 application by *post hoc* oral modification of the Employment Agreement. Further, because patent assignments must be in writing, Mr. Girard could not have obtained rights to the '888 application by oral assignment. *See Sky Techs.*, 576 F.3d at 1379 ("The Federal Patent Act requires that all assignments of patent interest be in writing.") (citing 35 U.S.C. § 261).

*Second*, as to whether Mr. Girard's work at issue was performed during "normal working hours," Mr. Girard declares that his work hours were "ad hoc" and that his "role at Iperia was never a 9:00 A.M. to 5:00 P.M. job." Dkt. No. 107 at ¶ 15. Read in this context, the "normal working hours" provision of the Employment Agreement cannot be meaningfully applied because Mr. Girard did not have consistent working hours. Plaintiff has therefore sufficiently shown that this provision does not operate to invoke the automatic assignment provision of the Employment Agreement.

*Third*, as to whether Mr. Girard used Iperia's premises or equipment, Mr. Girard declares that he "worked on the subject matter of [his] Provisional Application at home using [his] own computer equipment." Dkt. No. 107 at ¶ 15. Defendants have not sufficiently shown otherwise. Mr. Girard did use Iperia's "Proprietary Information," however, as evidenced by Mr. Girard's citation of the SIP-TSI provisional application in his own '888 application. A review of these

applications indicates that Mr. Girard's '888 application grew out of the SIP-TSI provisional application and related subject matter.  In other words, the '888 application may disclose a useful, novel, and non-obvious invention, but Mr. Girard built any such invention on work that Iperia had done.  Further, this work by Iperia had been confidential.  The SIP-TSI provisional application, like all provisional applications, was neither published nor made publicly available by the United States Patent and Trademark Office ("USPTO").  *See* 35 U.S.C. § 122(a) & (b)(2)(A)(iii); *see also* 37 CFR 1.211(b); Manual of Patent Examining Procedure ("MPEP") § 1120.  The USPTO did not publish the SIP-TSI non-provisional application until November 1, 2001, roughly six months after Mr. Girard filed his '888 application.  *Compare* U.S. Pat. Publ'n No. 2001/0036176, Dkt. No. 74, Smith Ex. 11 *with* '888 application, Smith Ex. 12.

Plaintiff argues that the content of the SIP-TSI provisional application was published in March 2000, in an article co-authored by Mr. Girard.  Dkt. No. 106 at 14-15 (citing Dkt. No. 107, Girard Ex. F).  That article, although apparently based on the SIP-TSI provisional application filed in February 2000, differs significantly.  For example, Defendants persuasively submit that the March 2000 article "omits the detailed description of the operation of the Software Switch Controller, the Telephony Application Server, and the Media Gateway contained in the SIP-TSI Provisional Application."  Dkt. No. 137 at 8; *compare* Dkt. No. 74, Smith Ex. 11 at 12-19 *with* Dkt. No. 107, Girard Ex. F.  Also telling, even though the SIP-TSI provisional application remained confidential, Mr. Girard chose to cite it—rather than the March 2000 article—in his '888 application.  Although Plaintiff argues that Mr. Girard's '888 application is primarily directed to peer-to-peer call management, which is apparently not disclosed in the SIP-TSI applications, the Employment Agreement does not state that assignment occurs only where the

24

employee's purported invention *is* the employer's pre-existing Proprietary Information.  *See* Dkt. No. 106, Ex. 3 at § 6.2(b).  Such a narrow reading seems contradictory because an invention presumably includes something new, *i.e.*, something that was not already part of the company's Proprietary Information.  Instead, the Employment Agreement broadly states that assignment occurs where the employee's purported invention "uses" the employer's Proprietary Information. *Id.*  Here again, Mr. Girard evidently self-negotiated this provision and therefore could have drafted this provision more narrowly if that had been the true intent of the parties thereto.  On balance, Plaintiff has failed to show that Mr. Girard did not base his '888 application at least in part on Iperia's confidential Proprietary Information.

In summary, Mr. Girard's '888 application (which led to the '519 Patent in suit) satisfies the first and third conditions of the assignment provisions in Section 6.2 of the Employment Agreement.  Not only is the '519 Patent related to Iperia's general field of business, namely telecommunications, the '519 Patent also relates to call control and the SIP protocol (as discussed above), which are subjects on which Iperia filed patent applications.  Finding lack of relatedness would slice the scope of Iperia's business too thin, especially given that Mr. Girard signed the Employment Agreement for both parties thereto and used relatively broad terms such as "relate" and "present or planned business or research and development."  Dkt. No. 106, Ex. 3 at § 6.2(b).  The purported invention of the '519 Patent was thus automatically assigned to Iperia pursuant to the first condition of Section 6.2(b).  Alternatively, Mr. Girard created the purported invention using Iperia's Proprietary Information (as discussed above), thus satisfying the third condition of Section 6.2(b).  This result comports with the apparent general intent of the Employment Agreement that all inventions arising out of Iperia's business would be

automatically assigned to Iperia.  *See generally* Dkt. No. 106, Ex. 3 at § 6.

Defendants' motion to dismiss for lack of standing should therefore be GRANTED.  The Court need not reach Defendants' alternate grounds, namely, whether the invention at issue was assigned to Iperia under state law doctrines, such as by an employment to invent or pursuant to fiduciary obligations.  Also, the Court reaches its conclusion on Defendants' motion to dismiss without relying on any recent statements and testimony by Iperia, the credibility of which is in dispute.

**B.  Plaintiff's Motion to Disqualify Counsel and for Sanctions**

In light of the finding above that the Court does not have subject matter jurisdiction, the above-captioned case cannot proceed on the merits, so Plaintiff's motion to disqualify counsel is moot.  The Court nonetheless considers Plaintiff's motion for sanctions.  *See Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992) ("The interest in having rules of procedure obeyed . . . does not disappear upon a subsequent determination that the court was without subject-matter jurisdiction. . . . [T]here is no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules in the interim, and to allow the courts to impose Rule 11 sanctions in the event of their failure to do so.")

(1) Patent Assignment Agreement

The Patent Assignment Agreement executed by Defendants and Iperia contains the following provisions that form the basis for Plaintiff's allegations of improper payment in exchange for favorable testimony:

2.1 General Payment
. . .
Final Payment: Within ten (10) business days after any court of competent

jurisdiction confirms Cisco's ownership of the '519 Patent or the District Court for the Eastern District of Texas dismisses Case No 5:08 CV 20 (the "'519 Patent Action") based on lack of subject matter jurisdiction ("Favorable Court Ruling"), Cisco shall pay to Iperia the sum of $200,000.

3.2 Assistance.  Iperia, on behalf of itself and its Affiliates, agrees to use its best efforts to assist Cisco in obtaining and perfecting Iperia's assignment of the '519 Patent to Cisco including without limitation, making available to Cisco all information and documentary evidence relevant to obtaining and perfecting Iperia's assignment of the '519 Patent to Cisco.  Such assistance shall also include, without limitation, at Cisco's direction and request, allowing Cisco's representatives to examine Iperia's records related to Girard's employment; providing documents, testimonies and declarations relevant to Iperia's original ownership of, and right to transfer, the '519 Patent; filing an action to perfect Iperia's rights in and to transfer the '519 Patent (such to be at Cisco's expense); and any other reasonable request Cisco may deem necessary or desirable to assert its rights to and in the '519 Patent.

3/12/2009 Patent Assignment Agreement, Dkt. No. 73 at Ex. A.  An agreement that provides payment contingent on cooperation and the outcome of litigation, made in connection with an assignment or license of patent rights, is not necessarily improper.  *See Ethicon*, 135 F.3d at 1465.  Plaintiff argues that *Ethicon* is distinguishable as involving payments to a co-inventor rather than to a former employer.  Dkt. No. 108 at 4.  The Court finds no significant import in this distinction because the co-inventor in *Ethicon*, just like Iperia, was given a pecuniary interest in the paying party's success.  Plaintiff also argues that *Ethicon* is inapplicable because that court did not apply the law of the Fifth Circuit (*id.* at 3), but Plaintiff has not submitted any Fifth Circuit authority on point.  The Court therefore finds *Ethicon* persuasive.  In sum, Plaintiff has not shown that the Patent Assignment Agreement is illegal, unethical, or otherwise forbidden.

Plaintiff relies in part on the opinion of a Special Master in *St. Clair*.  *See St. Clair Intellectual Property Consultants v. Canon, Inc.*, No. 03-241 JJF (D. Del. Nov. 17, 2005), Dkt. No. 108 at Ex. S.  First, *St. Clair* is not binding authority on this Court.  Second, the Special

Master in *St. Clair* did not "definitely opine" on the agreement at issue but rather only noted that

it was "clearly questionable." *Id.* at 24-25.  Third, *St. Clair* is also distinguishable as involving

concealment of the agreement at issue until mid-trial, and the agreement was not tied to a transfer

of patent rights.  *Id.* at 25, 44-52, & 61-62.  In the above-captioned case, by contrast, Defendants

produced the Patent Assignment Agreement to Plaintiff, and that agreement includes an

assignment.

Further, the ethical rules cited by Plaintiff are not directed to the present circumstances.

*See* ABA Model Rules of Prof'l Conduct R. 3.4 cmt. (2004), Cal. Rule of Prof'l Conduct 5-310,

Mass. Rule of Prof'l Conduct 3.4(g), and ABA Model Code of Professional Responsibility

Disciplinary Rule 7-109 and Ethical Consideration 7-28.  Not surprisingly, Iperia has a financial

stake in whether or not title to Mr. Girard's '888 application was assigned to Iperia by operation

of the Employment Agreement.  As Defendants submit, the value of Iperia's assignment to

Defendants is impacted by a finding that Iperia actually acquired title.  On balance, Iperia's

"pecuniary interest in the outcome of [this] case goes to the probative weight of [its] testimony

. . . ." *Ethicon*, 135 F.3d at 1465.

(2) Discovery Misconduct

Turning to discovery misconduct, Plaintiff has shown that Defendants obtained the

Employment Agreement from Iperia on February 16, 2009, three days before Mr. Girard's

deposition.  *See* 2/16/2009 e-mail from Waicberg to Sharper, Dkt. No. 73 at Ex. C; 6/4/2009

Waicberg dep., Dkt. No. 108, Ex. N at 164:16-165:6; 7/15/2009 Sharper dep., Dkt. No. 108,

Ex. W at 66:9-70:17 & 128:19-129:10.  Defendants failed to produce that agreement until

April 7, 2009.  This Employment Agreement is the key document that Defendants (and now the

Court, as well) have relied upon in support of Defendants' motion to dismiss.  Defendants

evidently recognized the importance of the Employment Agreement at the time of Mr. Girard's

deposition, too, because Defendants had specifically requested any such agreement from Iperia,

and Defendants questioned Mr. Girard about the agreement at his deposition.  *See* 7/15/2009

Sharper dep., Dkt. No. 108, Ex. W at 66:9-70:17; 2/19/2009 Girard dep., Dkt. No. 139, Ex. 11 at

79:17-24 & 81:5-85:6.[3]  Plaintiff suffered prejudice in that Mr. Girard could not refresh his

recollection with the Employment Agreement and Plaintiff could not question Mr. Girard

regarding that actual agreement at deposition.  *See Thibeault v. Square D Co.*, 960 F.2d 239, 244

(1st Cir. 1992) (in assessing a failure to supplement under Rule 26(e), court should consider

"ability of the opposing party to formulate a response") (citation and quotation marks omitted);

*see also* Girard Decl., Dkt. No. 107 at ¶ 18 ("At the time that [Defendants] took my deposition

back in February 2009, I had not seen a copy of my Employment Agreement for about seven

years.").

Having relied upon the Employment Agreement to show that Plaintiff lacks standing,

Defendants cannot credibly maintain that they believed the Employment Agreement was too

unimportant to produce immediately upon receipt or at least prior to the close of Mr. Girard's

---

[3]  The deposition testimony of Sam Waicberg (Iperia) and Sayuri Sharper (Defendants' counsel) indicates that Defendants specifically asked Iperia for any employment agreement between Iperia and Mr. Girard.  6/4/2009 Waicberg dep., Dkt. No. 108, Ex. N at 164:16-165:6; 7/15/2009 Sharper dep., Dkt. No. 108, Ex. W at 66:9-70:17 & 128:19-129:10.  A February 16, 2009 e-mail from Mr. Waicberg to Ms. Sharper attached the Employment Agreement and stated "Hi Sayuri, here you go.  Let me know if this has the info you were looking for."  2/16/2009 e-mail from Waicberg to Sharper, Dkt. No. 73 at Ex. C; *see also* Dkt. No. 108, Ex. W at 101:24-102:7 ("Q. . . . [D]id Mr. Waicberg send you [Ms. Sharper] any other documents before the deposition of Mr. Girard outside of his Employment Agreement.  A.  No.  Q.  So there was only one document, a single Employment Agreement, sent to you by e-mail by Mr. Waicberg prior to the deposition of Greg Girard; correct?  A.  Correct.").  Plaintiff also submits that Ms. Sharper herself attended the two-day deposition of Mr. Girard.  Dkt. No. 73 at 3.  Defendants thus asked Iperia for a proverbial "silver bullet," Iperia explicitly provided it, and three days later at Mr. Girard's deposition, Defendants' counsel failed to disclose what they had found, despite asking questions about it.  This conduct falls below the standards expected of counsel, at least by Rules 26(e) and 37, as discussed in this Order.

deposition.  For instance, the Employment Agreement was subject to mandatory disclosure as a

document that Defendants "may use to support its claims or defenses," and Defendants had an

ongoing duty to produce such documents "in a timely manner."  Fed. R. Civ. P. 26(a)(1)(A)(ii) &

(e)(1)(A).[4]  The Employment Agreement was also within the scope of document requests that

Plaintiff had served on Defendants.  *See* Plaintiff's Production Requests, Dkt. No. 73, Exs. F

(served Apr. 8, 2008) & G (served Aug. 27, 2008).  Moreover, mere hours before Iperia provided

the Employment Agreement to Defendants' counsel, Plaintiff's counsel e-mailed Defendants'

counsel asking whether any documents had been received from Iperia.  *See id.* at Ex. B.

Defendants counsel responded that no documents had been received from Iperia.  *See id.*[5]

Nonetheless, Plaintiff had made clear the importance of timely producing the Iperia documents,

including the Employment Agreement.  The importance was also self evident, as born out by

Defendants' ongoing negotiations with Iperia to purchase an assignment.[6]  Defendants thus

should have timely produced the Employment Agreement regardless of whether Mr. Girard was

the first to mention it at his deposition, especially given that Defendants then questioned Mr.

---

[4] *See also* Local Rule CV-26 (discussing scope of term "relevant to the claim or defense," including "(3) . . . information that is likely to have an influence on or affect the outcome of a claim or defense; (4) . . . information that deserves to be considered in the preparation, evaluation or trial of a claim or defense; and (5) . . . information that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate or try a claim or defense."

[5] The e-mails at issue include time information but no indication of time zone.  *See* Dkt. No. 73 at Exs. B & C.  Rather than exhaustively exploring precisely when Defendants' counsel stated they had not received documents from Iperia *vis a vis* when Iperia provided the Employment Agreement to Defendants counsel, the Court merely accepts that Defendants' counsel's statement was true when made but that Iperia produced the Employment Agreement to Defendants' counsel within hours thereafter.

[6] Although Defendants and Iperia did not execute the agreement until March 12, 2009, they were negotiating in advance of that date, likely even in advance of Mr. Girard's deposition.  *See* 6/4/2009 Waicberg dep., Dkt. No. 108, Ex. N at 162:8-164:15 ("Q.  Had Cisco already told you they were interested in purchasing the asset? [Objection]  In the mid-February period?  [Objection]  A.  Possibly around that time frame.  Q.  Around that time frame?  A.  Yes."); *see also* 7/14/2009 Phillips dep., Dkt. No. 108 at Ex. O (regarding meetings between Iperia and Cisco in early March 2009); 7/14/2009 O'Connor dep., Dkt. No. 108 at Ex. P (same).

Girard about it.  *See* 2/19/2009 Girard dep., Dkt. No. 139, Ex. 11 at 79:17-24 & 81:5-85:6.  In

sum, Defendants' counsel should have timely produced the Employment Agreement to Plaintiff,

certainly no later than prior to the close of Mr. Girard's deposition.

At the November 20, 2009 hearing, Defendants admitted that their counsel had a copy of

the Employment Agreement in his possession when deposing Mr. Girard.  *See* 11/20/2009 Hr'g

Tr., Dkt. No. 179 ("Hr'g Tr.") at 40:9-14.  Defendants asserted at the November 20, 2009 hearing

that the reason their counsel did not produce a copy of the Employment Agreement at Mr.

Girard's deposition is privileged.  *See id.* at 42:7-43:19.  The attorney that deposed Mr. Girard,

seated a mere few yards away at the defense table, offered no explanation either, despite the

Court's invitation.  *See id.*  Defendants have not requested or made an *in camera* submission to

explain their conduct, either.  The Court cannot reward Defendants' decision to stand behind

privilege (if any privilege or work product doctrine even applies) as to why Defendants' failed to

timely produce the Employment Agreement.  Defendants' conduct suggests that winning their

motion to dismiss has been more important to Defendants than conducting themselves in a fair

and forthright matter in compliance with the Federal Rules of Civil Procedure, as well as the

professional standards expected of all attorneys practicing in this Court's district.[7]

Plaintiff's motion for sanctions requests that the Court deny Defendants' motion to

dismiss as a sanction.  First, Plaintiff primarily based this request on the alleged impropriety of

the Patent Assignment Agreement, but the Court has declined to find that agreement improper.

---

[7] *See, e.g.*, Local Rule AT-3, Standards of Practice to be Observed by Attorneys:
    . . .
        (B) A lawyer owes, to the judiciary, candor, diligence and utmost respect.
        (C) A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the
    observance of which is necessary for the efficient administration of our system of justice and the
    respect of the public it serves.

Second, subject matter jurisdiction cannot be waived, and Plaintiff has not shown that the Court

can, as a sanction, retain subject matter jurisdiction despite a demonstration that Plaintiff lacks

standing.  Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks

subject-matter jurisdiction, the court must dismiss the action.").  Plaintiff's request to dismiss

Defendants' motion to dismiss should therefore be DENIED.  Likewise, Plaintiff's request to

make public its motion to disqualify and related materials should be DENIED.  Plaintiff's request

to modify the Protective Order to allow such materials to be submitted to state bar disciplinary

commissions is hereby DENIED.  Here again, Plaintiff primarily bases these requests on the

alleged impropriety of the Patent Assignment Agreement, but the Court has ruled against the

Plaintiff in this regard, above.

     Nonetheless, some substantial sanction should be imposed because "[i]f primarily

responsibility for conducting discovery is to continue to rest with the litigants, they must be

obliged to act responsibly and avoid abuse."  Fed. R. Civ. P. 26(g) Advisory Committee Notes

(1983 Amendment); *see In re Am. Airlines*, 972 F.2d 605 (5th Cir. 1992) ("[A] district court is

obliged to take measures against unethical conduct occurring in connection with any proceeding

before it.") (citation and quotation marks omitted).  As noted above, Rule 26(e) provides a duty

to supplement Rule 26(a) disclosures.[8]  Failure to properly supplement discovery responses can

support imposition of a sanction, and "Rule 26 imposes no requirement, express or implied, that

a motion to compel precede a court's imposition of a sanction."  *Alldread v. City of Grenada*,

---

[8] *See also* Local Rule CV-26 (discussing that scope of discovery under standard of "relevan[ce] to the claim or defense of any party" includes "(3) . . . information that is likely to have an influence on or affect the outcome of a claim or defense; (4) . . . information that deserves to be considered in the preparation, evaluation or trial of a claim or defense; and (5) . . . information that reasonable and competent counsel would consider reasonably necessary to prepare, evaluate or try a claim or defense."

988 F.2d 1425, 1435-36 (5th Cir. 1993) (regarding exclusion as a sanction for delay in providing substantive information concerning proposed expert testimony).[9] Rule 37(c)(1) provides that where a party fails to meet its Rule 26(e) obligations, "the court, on motion and after giving an opportunity to be heard: . . .(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure; . . . and (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."   Rule 37(b)(2)(A)(i)-(vi) lists case-oriented sanctions, such as limiting evidence, striking pleadings, dismissing the action, or rendering a default judgment.  In the present case, case-oriented sanctions are unavailable because the Court has found, above, that it lacks subject matter jurisdiction.

But if only case-oriented sanctions were considered under the present circumstances, then Defendants would be able to escape the above-captioned case with no sanction at all, even though Defendants misconduct relates to the very document on which the Court has relied to find lack of subject matter jurisdiction.  The Court can award "expenses, including attorney's fees, caused by the failure," as well as other appropriate sanctions.  Fed. Rule. Civ. P. 37(c)(1)(A); *see also* 37(a)(5), (b)(2)(C), & (d)(3); *B. F. Goodrich Tire Co. v. Lyster*, 328 F.2d 411, 415 (5th Cir. 1964) ("We read Rule 37 as establishing a flexible means by which a court may enforce compliance with the Federal discovery procedures through a broad choice of remedies and penalties."); *Bankatlantic v. Blythe Eastman Paine Webber, Inc.*, 130 F.R.D. 153, 154 (S.D. Fla. 1990) (pursuing sanctions against prevailing defendant because "[e]nforcement of the sanctions

---

[9]   *See also* Wright, Miller & Marcus, Federal Practice and Procedure: Civil 2d §§ 2049.1 & 2050; *Thibeault*, 960 F.2d at 245 ("[W]hen Rule 26(e) is flouted, district courts possess the power to impose sanctions without first issuing a firm discovery deadline or an admonitory order."); *Bradley v. U.S.*, 866 F.2d 120, 124 n.6 (5th Cir. 1989) ("We note that, unlike rule 16(f), rule 26(e)(1) does not explicitly grant the court authority to sanction parties for violations. . . . [T]he power of a trial court to impose sanctions for rule 26(e)(1) violations has been affirmed repeatedly by this court and others. ").

order is necessary to serve the punishment and deterrence goals of the rule and to vindicate the integrity of the Court and discovery process.").

Also, the Court has inherent power to impose appropriate sanctions and penalties.  *See Flaksa v. Little River Marine Const. Co.*, 389 F.2d 885, 888-89 & n.10 (5th Cir. 1968); *Diaz v. Southern Drilling Corp.,* 427 F.2d 1118, 1126 (5th Cir. 1970) (under Rule 37, "application of sanctions is entrusted to the discretion of the trial judge, and overleniency is to be avoided where it results in inadequate protection of discovery."); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1407, 1411 (5th Cir. 1993) ("The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it" (quoting *Flaksa*, 389 F.2d at 888 n.10), and the Federal Rules of Civil Procedure do not "completely describe the federal courts' power over civil procedure, displacing any inherent authority in this area").

Defendants have had a reasonable opportunity to respond to Plaintiff's motion for sanctions, through written opposition as well as oral argument at the November 20, 2009 hearing. *See Margoles v. Johns*, 587 F.2d 885 (7th Cir. 1978) (finding no need for evidentiary hearing where "briefs and affidavits fully recounted the circumstances surrounding the noncompliance"); *Muthig v. Point Nantucket Inc.*, 838 F.2d 600, 606-07 (1st Cir. 1988) (finding that briefing on motion for sanctions provided adequate notice and opportunity to be heard).  No further hearing is necessary to impose sanctions.

The Court finds that Defendants withheld timely production of the Employment Agreement through a deliberate, willful failure to disclose, thereby consciously disregarding Plaintiff's rights.  *See U.S. v. $49,000 Currency,* 330 F.3d 371, 376 (5th Cir. 2003) (penalized

party's discovery violation must be willful); *Dorsey v. Academy Moving & Storage, Inc.*, 423 F.2d 858, 860 (5th Cir. 1970) (Wisdom, J.) ("The sanctions available under Rule 37(b) . . . are predicated upon the presence of such factors as willful disobedience, gross indifference to the right of the adverse party, deliberate callousness, or gross negligence.").  Plaintiff's motion for sanctions should therefore be GRANTED IN PART AS MODIFIED herein.  Pursuant to Rule 37, Defendants shall reimburse Plaintiff for all expenses (including attorney's fees) reasonably associated with Defendants' failure to timely produce the Employment Agreement, as well as expenses (including attorney's fees) for deposition time during which Mr. Girard discussed the Employment Agreement or Defendants questioned Mr. Girard regarding the Employment Agreement.  If the parties are unable to agree on the amount of such expenses, any such dispute should be submitted to the Court by appropriate motion <u>within 30 days of this Order</u>.

In addition, <u>Defendants shall also pay, within 30 days of this Order, a fine of $100,000.00</u> to the Fines and Restitution Account of the Court.  Such a fine is necessary and appropriate to protect the sound administration of justice and to punish and deter violation of the Federal Rules of Civil Procedure, the Court's Local Rules, and the professional standards of this Court's district.  *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763-64 (1980) ("Rule 37 sanctions must be applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction, and to deter those who might be tempted to such conduct in the absence of such a deterrent") (citation and quotation marks omitted); *Gonsalves v. City of New Bedford*, 168 F.R.D. 102, 116-118 (D. Mass. 1996); *U.S. v. Shaffer Equipment Co.*, 158 F.R.D. 80, 87-88 (S.D. W. Va. 1994); *Pereira v. Narragansett Fishing Corp.*, 135 F.R.D. 24, 26 (D. Mass. 1991); *J.M.*

*Cleminshaw Co. v. City of Norwich*, 93 F.R.D. 338, 358-360 (D. Conn. 1981).[10]  In determining

the amount of this fine, the Court has considered the magnitude of the above-captioned case (but

for lack of subject matter jurisdiction), the size and wealth of Defendants (Cisco Systems, Inc.

and Cisco-Linksys, LLC) and the law firm representing them (Quinn Emanuel Urquhart Oliver &

Hedges LLP), and the absence of any explanation for the misconduct of the attorneys involved.

## IV.  CONCLUSION

Defendants' Motion to Dismiss for Lack of Standing (Dkt. No. 71) is hereby

**GRANTED**.  The Court enters a Judgement of Dismissal contemporaneously herewith.

Plaintiff's Motion to Disqualify Counsel and Impose Sanctions on Defendants and their

Counsel for Improperly Offering Financial Incentives in Exchange for Testimony (Dkt. No. 73)

is hereby **GRANTED IN PART AS MODIFIED**.  Defendants are hereby **ORDERED** to

reimburse Plaintiff for all expenses (including attorney's fees) reasonably associated with

Defendants' failure to timely produce the Employment Agreement, as well as expenses

(including attorney's fees) for deposition time during which Mr. Girard discussed the

Employment Agreement or Defendants questioned Mr. Girard regarding the Employment

Agreement.  If the parties are unable to agree on the amount of such expenses, any such dispute

should be submitted to the Court by appropriate motion within 30 days of this Order.  To the

---

[10]  Also, Rule 16(f) gives the Court authority, "[o]n motion or on its own," to enter "any just orders" where a party "fails to obey a scheduling or other pretrial order."  Fed. R. Civ. P. 16(f)(1)(C).  The Court's March 12, 2008 General Discovery Order provided in part: "Duty to Supplement: After disclosure is made pursuant to the Court's Docket Control Order, each party is under a duty to supplement or correct its disclosures immediately if the party obtains information on the basis of which it knows the information disclosed was either incomplete or incorrect when made, or is no longer complete or true."  As discussed above, the Employment Agreement was the subject of mandatory disclosure under Rule 26(a) as well as Plaintiff's discovery requests.  *See also* Local Rule CV-26. Defendants' failure to timely disclose the Employment Agreement rendered their disclosures "incomplete," and Defendants thus violated this Court's order.  Imposition of a fine is a "just order" under these circumstances.  Fed. R. Civ. P. 16(f); *see Media Duplication Servs., Ltd. v. HDG Software, Inc.*, 928 F.2d 1228, 1241-42 (1st Cir. 1991).

extent not granted herein, Plaintiff's motion is hereby **DENIED**.

In addition, <u>Defendants are hereby **ORDERED** to pay, within 30 days of this Order, a fine of $100,000.00</u> to the Fines and Restitution Account of the Court.

**IT IS SO ORDERED.**

**SIGNED this 30th day of December, 2009.**


DAVID FOLSOM
UNITED STATES DISTRICT JUDGE